Estate of Eugene H. Kelly, Deceased, John C. Kelly, Eugene F. Kelly, and Arthur Lennon Kelly, Executors v. Commissioner.
Estate of Kelly v. Commissioner
Docket No. 45283.
United States Tax Court
T.C. Memo 1955-129; 1955 Tax Ct. Memo LEXIS 211; 14 T.C.M. (CCH) 476; T.C.M. (RIA) 55129; May 20, 1955
*211 Held, that the fair market value of 106 shares of stock of Journal-Tribune Publishing Company, representing a minority interest in a closely owned publishing corporation, was $2,200 per share as of the applicable valuation date. Allen Whitfield, Esq., and G. O. Patterson, Esq., for the petitioner. Merl B. Peek, Esq., for the respondent. FISHER
Respondent determined a deficiency of $104,621.78 in estate tax of the petitioner. The only issue here involved, other than questions to be determined under Rule 50, is the fair market value of 106 shares of stock of Journal-Tribune Publishing Company as of the applicable valuation date. Memorandum Findings of Fact and Opinion The stipulated facts are so found and are incorporated herein by reference. Eugene H. Kelly died testate on May 16, 1948. The Federal Estate Tax Return of his estate was duly filed on August 16, 1949, the return being filed with, and the tax paid to, the collector of internal revenue at Des Moines, Iowa. The decedent's estate was valued as of the date of death of the decedent and the gross estate as reported in the Estate Tax Return reflected the inclusion of 106 shares of the stock of the *212 Journal-Tribune Publishing Company of Sioux City, Iowa, at a value of $516.13 per share of a total valuation of the 106 shares of $54,709.78. The investigating agent determined that the 106 shares of common stock had a fair market value of $106,000. The Commissioner of Internal Revenue later determined that this value should be increased in the amount of $318,000, making a total valuation of $424,000. For a number of years, prior to December 1, 1941, decedent was Secretary-Treasurer, and managing officer of the Tribune Company, a corporation that operated a daily newspaper (The Sioux CityTribune) in Sioux City, Iowa. The publication of the Sioux CityTribune by the Tribune Company was terminated on November 30, 1941. The Tribune Company then was finally liquidated and dissolved at the end of 1944. Prior to November 30, 1941, the Perkins Brothers Company, an Iowa corporation, with offices at Sioux City, Iowa, had published the Sioux City Journal, a newspaper in competition with the Sioux CityTribune. On November 30, 1941, the Perkins Brothers Company ceased publication of the Sioux City Journal. On November 26, 1941, the stockholders of the Tribune Company and the stockholders *213 of the Perkins Brothers Company entered into an agreement providing that the above-named corporations "hereby agree to lease their respective newspapers, known as the Journal, Sunday Journal and the Tribune, and all additions thereof now being published by them, and of which they are respectively the owners and proprietors, to a corporation presently to be incorporated under the laws of the State of Iowa, to be known and designated as JOURNAL-TRIBUNE PUBLISHING CO., the stock in which corporation has or will be subscribed by the individual stockholders of the parties hereto, * * *" The agreement also provided for the execution of the leases of their respective newspapers by the Tribune Company and the Perkins Brothers Company upon the filing of the articles of incorporation of the Journal-Tribune Publishing Company. It further provided: "a. The said leases shall provide for the immediate delivery to the Journal-Tribune Publishing Co. of the possession and use of the respective newspapers, including the subscriptions, good will, publishing and engraving equipment, machinery, contracts, franchises and all property, tangible and intangible, excepting real estate and other property *214 hereinafter mentioned as being exempted, which now or at the time of said transfer shall be possessed and enjoyed by the respective parties hereto in or about the publication of their respective newspapers and the conduct of their newspaper businesses. Said leases shall extend for the period of ninety-nine years from and after the date of the incorporation of said Journal-Tribune Publishing Co., and the annual rental shall be respectively the sum of $30,000, payable to first party [Perkins Brothers Company] and $20,000 payable to second party [The Tribune Company], their respective successors, assigns or legal representatives. The first year's rental shall be paid in cash; thereafter such annual rentals shall be paid at the end of each yearly period, and shall be payable only in the event that there shall be sufficient net earnings of the said Journal-Tribune Publishing Co. out of which the same may be paid. * * * "b. It is understood and agreed that such leases shall not include the bills and accounts receivable of the respective parties hereto whether for advertising, unpaid subscriptions accruing up to the date the said Journal-Tribune Co. shall commence publication of said *215 papers, as herein provided, or otherwise, and that all such shall be retained as the individual property of the respective parties hereto. Further all indebtedness of the said parties and their respective obligations, except such as are assumed by the said Journal-Tribune Co., as hereinafter specified, shall be paid and discharged by the respective parties hereto. * * *
"e. At the conclusion of the term of the leases, the Journal-Tribune Publishing Co. shall have the option to purchase the right, title and interest of the lessors in and to the leased property by paying therefor the fair market price at that time, * * *. The Journal-Tribune Publishing Co. shall have the right at any time to sell or otherwise dispose of any of the physical equipment covered by the leases, accounting for the proceeds thereof to the respective lessors at the termination of the leases." The agreement provided for the issuance of rental certificates by the Publishing Company on the request of the shareholders "acknowledging the said rental hereafter to accrue to each, and said instrument shall be transferable by the respective holders * * *." The agreement further provided: "3. The stockholders *216 of the respective parties hereto shall have the right to subscribe and have issued for them respectively certificates representing the capital stock of the said Journal-Tribune Publishing Co. in the following proportions: Sixty per cent thereof shall be allocated and subscribed by the present stockholders of first party [The Perkins Brothers Company], and forty per cent thereof shall be allocated and subscribed by the stockholders of the second party [The Tribune Company], and each individual stockholder shall be entitled to his proportionate share of stock in the new Company." The agreement further provided that: "5. The parties hereto agree that the Journal-Tribune Publishing Co. shall pay executive salaries for the period of five years from the date of its incorporation in the sum of Twenty Thousand Dollars per annum to Eugene Kelly, John Kelly and E. F. Kelly, to be apportioned as they mutually agree upon, and in the sum of Thirty Thousand Dollars per annum to W. H. Sammons, W. R. Perkins, and Clara P. Sammons, or their assigns, in like manner to be apportioned between them, such salaries to be included as a part of its operating expense. Provided that in the event of termination *217 of executive services by death or voluntary act of any of the foregoing parties, said executive salaries allowance shall be decreased by the amount which was being paid to any such individual or individuals." The merger agreement between the Tribune Company and the Perkins Brothers Company provided that the business of the Publishing Company would be conducted in the Journal Building, and that the Tribune Building would be rented at a reasonable rental, or subleased for a purpose not detrimental to the property, by the Publishing Company for a period of one year after its incorporation. The Tribune Company retained the right to cancel such lease, subject to any sublease in existence, within the one year's time. Such action by the Tribune Company would terminate the obligation to pay a reasonable rental on the part of the Publishing Company. The Publishing Company was organized on November 26, 1941. The articles of incorporation provided for an authorized capital stock of $50,000, divided into 500 shares with par value of $100 per share. It further provided for the issuance of 60 per cent, or 300 shares to the shareholders of Perkins Brothers Company and 40 per cent or 200 shares, *218 to shareholders of the Tribune Company. The Publishing Company had no preferred stock, and no funded debt. Article III of the Articles of Incorporation of the Publishing Company provided as follows: "Said stockholders of the Journal-Tribune Publishing Co. agree not to sell to anyone their respective holdings of stock in the Journal-Tribune Publishing Co. without first offering the same for sale at such bona fide price as they are able to receive elsewhere, prorata to the then remaining stockholders of the Journal-Tribune Publishing Company who hold stock originally issued in the Journal or Tribune groups respectively. In event no stockholder accepts the offer to sell, required under the preceding sentence, then the stockholders desiring to sell their stock, before selling the same to others shall first offer the stock for sale to all the remaining stockholders of the Journal-Tribune Publishing Co., without restriction as to class of the original ownership of said remaining stockholders. Remaining stockholders, or any of them electing to accept offers to sell stock pursuant to this Article shall have a reasonable time from the date of the offer to sell within which to complete *219 the purchase and make payment for the stock. No transfer by judicial sale shall be valid unless the vendor shall comply with the foregoing provision." The shares of stock of the Journal-Tribune Publishing Company were not listed on any stock exchange or traded over the counter. There have been no arm's-length sales of this stock since the formation of the Journal-Tribune Publishing Company, and neither the executors nor the trustees of the decedent have ever been approached by anyone seeking to buy the 106 shares of stock in question here. The Journal-Tribune Publishing Company began publication of the Sioux City Journal and the Sioux City Sunday Journal and the Sioux City Journal-Tribune on December 1, 1941. Prior to the formation of this corporation, there were two competing newspaper organizations in Sioux City, Iowa. One organization was owned by individuals who were members of the Perkins family and the other organization by individuals who were members of the Kelly family. When the new corporation was organized, 500 shares of common stock were issued, 300 shares being purchased by the Perkins family and 200 shares by the Kelly family. The Journal-Tribune Publishing Company *220 had a total of five directors, and by agreement entered into at the time of the formation of the corporation, three of these directors were representatives or members of the Perkins family and two directors were members or representatives of the Kelly family. During the entire period from 1941 to the death of this decedent, the Perkins' interests were in control of the Board of Directors of the Journal-Tribune Publishing Company. No dividends were paid by the Journal-Tribune Publishing Company during the fiscal years ending October 31, 1942, October 31, 1943, October 31, 1944, October 31, 1945. Dividends of $100 per share were paid during the fiscal year ending October 31, 1946. Dividends of $300 per share were paid during the fiscal year 1947, and dividends of $200 per share were paid during the period from November 1, 1947, to May 16, 1948. Insistence and pressure from the directors representing the Kelly interests were instrumental in bringing about action on the part of the Board of Directors to declare such dividends. Pursuant to the provisions of the November 26, 1941 agreement, the Tribune Company and the Perkins Brothers Company leased their respective newspaper properties *221 to the Publishing Company. The respective lease agreements dated December 1, 1941, provided for the leasing of the Sioux City Journal and Sunday Journal (on the part of the Perkins Brothers Company) and the Tribune (on the part of the Tribune Company) to the Publishing Company, for a term of ninety-nine years from December 1, 1941, to December 1, 2040, at the annual rental already referred to in these findings. The following are the condensed comparative balance sheets of the Publishing Company at October 31, 1942, 1943, 1944, 1945, 1946, and 1947: JOURNAL-TRIBUNE PUBLISHING COMPANY
Sioux City, Iowa
CONDENSED COMPARATIVE BALANCE SHEETS
October 31
ASSETS
1942
1943
1944
1945
Cash
$ 94,283.12
$205,841.73
$322,654.18
$440,828.38
Notes and Accounts Receiv-
able
80,021.18
88,145.33
92,504.17
99,328.02
Inventories
19,675.10
24,895.35
13,978.74
18,996.63
U.S. Government Obligations
4,000.00
99,000.00
124,000.00
152,504.76
Stock
Accrued Interest
118.30
1,023.28
2,330.83
Prepaid Rent
4,166.74
4,166.74
4,166.74
4,166.74
Suspense Account
4,810.00
4,810.00
5,087.48
Post War Refund Receivable
43,410.76
$206,956.14
$426,977.45
$606,825.35
$718,155.36
LIABILITIES
Accounts Payable
$ 64,207.74
$ 21,220.99
$ 15,722.13
$ 64,762.22
Notes, Mortgages, etc.
50,000.00
100,000.00
100,000.00
50,000.00
Accrued Taxes
22,839.81
192,078.53
269,275.41
268,224.40
Reserve for Replacement of
Equipment
1,455.50
2,687.49
1,994.13
11,492.52
Capital Stock - Common (500
shares)
50,000.00
50,000.00
50,000.00
50,000.00
Earned Surplus
18,453.09
60,990.44
169,833.68
273,676.22
$206,956.14
$426,977.45
$606,825.35
$718,155.36
*222 JOURNAL-TRIBUNE PUBLISHING COMPANY
Sioux City, Iowa
CONDENSED COMPARATIVE BALANCE SHEETS
ASSETS
1946
1947
Cash
$557,204.38
$ 568,256.25
Notes and Accounts Receiv-
able
135,000.69
158,423.97
Inventories
26,057.34
34,460.03
U.S. Government Obligations
134,000.00
259,000.00
Stock
1,000.00
Accrued Interest
3,157.50
1,680.00
Prepaid Rent
4,166.74
4,166.74
Suspense Account
Post War Refund Receivable
$859,586.65
$1,026,986.99
LIABILITIES
Accounts Payable
$ 84,480.61
$ 111,767.35
Notes, Mortgages, etc.
Accrued Taxes
223,036.26
204,039.52
Reserve for Replacement of
Equipment
4,550.24
2,258.05
Capital Stock - Common (500
shares)
50,000.00
50,000.00
Earned Surplus
497,519.54
658,922.07
$859,586.65
$1,026,986.99
NOTE: The Reserve for Replacement of Equipment has been adjusted for all years to offset the cost of equipment purchases against the reserve. The following are the condensed profit and loss statements at October 31, 1942, 1943, 1944, 1945, 1946 and 1947. JOURNAL-TRIBUNE PUBLISHING COMPANY
SIOUX CITY, IOWA
CONDENSED COMPARATIVE STATEMENTS OF PROFIT AND LOSS
11 Months
Ended 10-31-42
Year Ended October 31
Gross Income
1943
1944
Advertising
$ 661,138.12
$ 782,001.61
$ 903,155.48
Circulation
431,455.17
560,553.83
625,979.94
Miscellaneous
40,118.18
24,017.57
31,254.48
Total Income
$1,132,711.47
$1,366,573.01
$1,560,389.90
Operating and Overhead
Expense
Editorial Department
$ 144,491.94
$ 148,548.16
$ 161,472.56
Advertising Department
68,890.92
74,767.22
89,188.80
Circulation
99,732.67
112,832.65
121,137.22
Composing Room
137,046.58
142,315.02
140,641.37
Press and Stereotype
80,482.09
73,647.97
75,766.14
Mail Room and Delivery
149,630.96
155,360.88
163,265.19
Paper and Ink
223,248.94
226,366.69
239,036.29
Photo Engraving
19,890.42
17,305.32
18,875.77
Business Office &
68,090.89
81,971.84
102,100.51
Administration
Comic Tabloid
23,287.33
Compensation to Officers
45,896.70
49,999.60
42,999.54
Rent
1943
1944
Lease
$ 45,833.26
$ 50,000.00
$ 50,000.00
Buildings
12,100.00
10,010.00
9,720.00
Total Expense
$1,095,335.37
$1,143,125.35
$1,237,490.72
Net Profits before Income
$ 37,376.10
$ 223,447.66
$ 322,899.18
Taxes
Less: Iowa Income Tax
181.58
597.69
1,293.78
Federal Income & Excess
18,778.93
180,312.62
212,652.44
Profits Tax
Declared Value Excess Profits
Tax
Net Profit Transferred to
$ 18,415.59
$ 42,537.35
$ 108,952.96
Surplus
Surplus Earned - Beginning of
18,453.09
60,990.44
Period, as Adjusted
$ 18,415.59
$ 60,990.44
$ 169,943.40
Dividends Paid
Adjustment of Excess Profits
Tax for 1945
Capital Stock Tax Adjustments
37.50
Payroll Tax Adjustments
(109.72)
Surplus Earned - End of
$ 18,453.09
$ 60,990.44
$ 169,833.68
Period
*223 JOURNAL-TRIBUNE PUBLISHING COMPANY
SIOUX CITY, IOWA
CONDENSED COMPARATIVE STATEMENTS OF PROFIT AND LOSS
Year Ended
October 31
Gross Income
1945
1946
1947
Advertising
$ 928,998.79
$1,228,058.72
$1,466,681.10
Circulation
675,917.73
715,155.39
762,756.18
Miscellaneous
25,205.02
83,708.77
60,494.32
Total Income
$1,630,121.54
$2,026,922.88
$2,289,931.60
Operating & Overhead Expense
Editorial Department
$ 155,767.78
$ 196,244.16
$ 215,591.88
Advertising Department
93,659.94
132,522.41
161,796.05
Circulation
125,847.54
148,081.09
148,577.41
Composing Room
145,359.26
173,982.54
219,772.34
Press & Stereotype
73,633.55
90,115.82
98,548.66
Mail Room & Delivery
170,450.26
188,539.07
216,121.54
Paper & Ink
217,128.30
352,207.68
450,852.62
Photo Engraving
19,530.55
24,923.84
25,048.00
Business Office &
150,209.53
105,991.15
107,292.32
Administration
Comic Tabloid
36,376.28
42,385.56
56,390.41
Compensation to Officers
24,499.59
21,999.60
22,000.00
Rent
Lease
50,000.00
50,000.00
50,000.00
Buildings
9,120.00
9,700.00
11,700.00
Total Expenses
$1,271,582.58
$1,536,692.92
$1,783,691.23
Net Profit before Income
$ 358,538.96
$ 490,229.96
$ 506,240.37
Taxes
Less: Iowa Income Tax
1,642.20
3,209.05
3,978.23
Federal Income & Excess
255,995.42
212,276.19
190,859.61
Profits Tax
Declared Value Excess Profits
392.13
Tax
Net Profit Transferred to
$ 100,509.21
$ 274,744.72
$ 311,402.53
Surplus
Surplus Earned - Beginning of
169,833.68
273,676.22
497,519.54
Period as Adjusted
$ 270,342.89
$ 548,420.94
$ 808,922.07
Dividends Paid
(50,000.00)
(150,000.00)
Adjustment of Excess Profits
(901.40)
Tax for 1945
Capital Stock Tax Adjustments
3,333.33
Payroll Tax Adjustments
Surplus Earned - End of
$ 273,676.22
$ 497,519.54
$ 658,922.07
Period
*224 The gross income, net taxable income, amount of Federal and State taxes paid on income, net income transferred to surplus, income available for dividends, and dividends paid for each of the years ending on October 31, 1942, 1943, 1944, 1945, 1946, and1947, are as follows: Annual
Federal
and State
Annual
Annual
Year
Annual
Annual Net
Taxes
Net Income
Income
Total
Ended
Gross
Taxable
Paid on
Transferred
Available
Dividends
Oct.
Income
Income
Income
to Surplus
for Dividends
Paid
31
1942 *
$1,132,711
$ 37,376
$ 18,960
$ 18,416
$ 18,453 *
1943
1,366,573
223,448
180,910
42,537
42,537
1944
1,560,390
322,899
213,946
108,953
108,843 **
1945
1,630,122
358,539
258,030
100,509
103,842 ***
1946
2,026,923
490,230
215,485
274,745
273,844 ****
$ 50,000
1947
2,289,932
506,240
194,838
311,403
311,403
150,000
The net assets per books of the Publishing Company (with no amount included therein for good will) and the *225 net book value per share for the years ending October 31, 1942, 1943, 1944, 1945, 1946, and 1947, are as follows: Year
Ended
Net Assets
Book Value
Oct. 31
(Per Books)
Per Share
1942
(a) $ 69,908.59
$ 139.82
1943
(b) 113,677.93
227.36
1944
(c) 221,827.81
443.65
1945
(d) 335,168.74
670.34
1946
(e) 552,069.78
1,104.14
1947
(f) 711,180.12
1,422.36
(a) Includes $1,455.50; (b) Includes $2,687.49; (c) Includes $1,994.13; (d) Includes $11,492.52; (e) Includes $4,550.24; (f) Includes $2,258.05, all from an account designated as Reserve for Replacement of Equipment. On April 30, 1948, the book value per share of the 500 shares of capital stock outstanding of Publishing Company is as follows: Capital Stock and Surplus, October 31,
$711,180.12
1947 *
Monthly earnings: November, 1947
$104,399.15
December, 1947
49,989.94
January, 1948
22,625.36
February, 1948
26,890.85
March, 1948
80,384.87
April, 1948
62,286.24
Total Earnings for Stated Period
$346,576.41
Less: 40% income tax on $346,576.41
$139,430.56
Dividend declared Jan. 5, 1948
50,000.00
Dividend declared May 3, 1948
50,000.00
Total
$239,430.56
Balance to be carried to Surplus
$107,145.85
Capital Stock and Surplus, April 30,
$818,326.97
1948
Net worth per share for 500 shares,
$ 1,636.65
per books
*226 On May 16, 1948, the Journal-Tribune Publishing Company did not own the machinery and equipment used by it in the publication and distribution of its newspaper. On May 16, 1948, the president and operating head of the Journal-Tribune Publishing Company was Mr. W. R. Perkins, who at that time was either 71 or 72 years of age. There were no other members of the Perkins family on the Board of Directors who possessed any management experience in connection with the operation of a newspaper. The building in which the Journal-Tribune Publishing Company operated and published its newspapers on May 16, 1948, was owned by the Perkins Brothers Company and not by the Journal-Tribune Publishing Company, and was leased by the Journal-Tribune Publishing Company. During the period 1941 through 1945, because of wartime conditions, the Journal-Tribune was unable to purchase needed equipment and to replace obsolete equipment. When the equipment became available, the Journal-Tribune contracted to purchase additional equipment and on May 16, 1948, a new press had been ordered at a cost of approximately $150,000. The Board of Directors had *227 also authorized the purchase of two new linotype machines costing approximately $15,000 each. Other equipment was on order in the approximate amount of $9,000. In the counties in Iowa where the Journal-Tribune is circulated, the major competitive newspaper is the Des Moines Register and Tribune and the Des Moines Sunday Register. The Audit Bureau of Circulation Report for the period ending March 31, 1948, states that the Journal-Tribune distributed 29,802 copies of the Sioux City Sunday Journal in Woodbury County, and the Des Moines Sunday Register has 10,642 subscribers in Woodbury County. During the period 1942 to the date of the Audit Report of 1948, the Des Moines Sunday Register had gained 2,000 subscribers in Woodbury County. The fact that the Des Moines Sunday Register has extensive circulation within the trading area of the Journal-Tribune, operated unfavorably in the solicitation of national advertisers by the Journal-Tribune. The Omaha World Herald, published in Omaha, Nebraska, distributed and sold its newspapers vigorously in the eleven Nebraska counties in which the Journal-Tribune was also circulated. The Sioux Falls Argus Leader and a newspaper published at Mitchell, *228 South Dakota, both competed with the Journal-Tribune for newspaper subscribers in South Dakota. On May 16, 1948, radio stations KSCJ, KTRI, and WNAX were operating in Sioux City, Iowa. From the beginning of the company in 1941 through 1948, no offer has been made to any member of the Kelly family to purchase any stock of the Journal-Tribune Publishing Company. In 1948, John C. Kelly and Eugene Kelly, sons of the decedent, owned a total of 92 shares between them. In that year, they attempted to borrow $65,000 by pledging the 92 shares as security for the loan. This loan was solicited from the Toy National Bank of Sioux City, Iowa. The bank refused to make the loan, basing their refusal on the fact that they felt the entailment of the stock prevented the stock from being suitable collateral. The fair market value of each of the 106 shares of stock of Journal-Tribune Publishing Company involved in this proceeding was $2,200 per share on May 16, 1948. Opinion FISHER, Judge: In view of the provisions of paragraph 20 of the stipulation of facts filed herein, it is unnecessary to consider in this Opinion the question relating to the marital deduction raised in respondent's brief. *229 Any problem in this connection will be considered in connection with the Rule 50 computation. The sole issue before us is the determination of the fair market value, as of May 16, 1948, of 106 shares of stock of Journal-Tribune Publishing Company. It is well established that fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both being informed of the material considerations. In O'Malley v. Ames, 197 Fed. (2d) 256 (C.A. 8, 1952), the court said (p. 258) that in the absence of evidence of transactions of purchase and sale or of an open market for stock, there is no single formula universally applicable in determining such value, and it is proper to consider all of the circumstances connected with the corporation. The court added (p. 258): "Among the factors that may properly be considered in determining the fair market value are corporate assets, corporate earnings, dividends, earning power of the corporation, prospects of the corporation, book value, bid and asked quotations, comparison with other stocks sold on the market and any other *230 factors which an informed purchaser and an informed seller would take into account. * * *" In the instant case, our ultimate finding of a fair market value of $2,200 per share for the 106 shares here involved on the date of decedent's death represents our conclusion based upon a consideration of all of the relevant testimony, exhibits and stipulated facts in the entire record. The various factors are too numerous and complex to be reviewed here in detail. We think it appropriate, however, to comment generally upon the more significant elements which we have taken into consideration. Petitioner produced three expert witnesses, and respondent two. For reasons hereinafter set forth, we are unable to accept the conclusions as to value expressed by any of them. We refer briefly to the views of each. Petitioner's first witness arrived at a value of $980.29 per share. He reached this conclusion by computing average annual dividends from the date of the inception of the corporation, capitalizing the average at 8 per cent and reducing the result by 15 per cent, the last in order to reflect the fact that the stock represented a minority holding, in a closely held corporation, had a limited *231 market, and was subject to the restrictions as to sale set forth in our findings. While the witness testified that he had considered numerous elements, including earnings and book value, to see if they might lead to an inconsistent result, it was apparent that the sole basis for his ultimate valuation was the computation above referred to. Moreover, in his calculation, he gave no effect to the fact that no dividends were declared in the earlier years included in his average, but substantial and increasing dividends were declared in the later years. It is our view that the witness overemphasized the factor of dividends, failed to give realistic consideration to the facts relating to the declaration of dividends in determining his average, and, in effect, de-emphasized other factors material to the determination of value, such as earnings. We think it apparent that the resultant valuation was far too low. Petitioner's second expert arrived at a value of $822 per share by the simple device of taking book value and cutting it in half. He, of course, testified that he had taken numerous factors into consideration, but his end result was calculated upon the basis above indicated. He *232 stated that he had not given consideration to earnings or dividends because they were reflected in net worth or book value, since earnings increase net worth while dividends decrease it. However accurate this view may be from a bookkeeping standpoint, the witness admitted, in effect, that it was inconsistent with the approach of petitioner's first expert, and it is quite apparent to us that, as applied by the witness, it is likewise inconsistent with well recognized principles of valuation. We think that, under the circumstances set forth in the record, book value was a factor less significant than earnings or dividends and that there was no sound basis for isolation of this factor by the witness. We add that there was no acceptable support for the discounting of book value to the extent of 50 per cent. The third expert for petitioner expressed the view that the fair market value of the stock would be not in excess of $1,320 per share. He reached this conclusion by capitalizing average earnings after taxes at a price earnings ratio of four times, less a discount of 25 per cent. The discount was attributed to the lack of a market for such minority holdings in a closely owned corporation, *233 and the nature of restrictions on sale. The practical result of his calculation was a per share value of only three times earnings. The approach of this witness was from the standpoint of the investor rather than that of a suppositious purchaser particularly interested in the publishing field, and represented a significant perspective in the effort to value a stock in which there was no known market and no trading. The witness, however, is an investment counselor retained by various institutional and banking corporations, and his analysis was that of a specialist representing ultra-conservative clients who would not normally be interested in an investment in stock of the type under consideration. He clearly represented the conservative buyer's viewpoint, and we have no doubt that the value determined by him from that perspective was substantially on the low side. The first expert for respondent valued the stock at not less than $4,000 a share. He testified that he gave primary consideration to earnings, secondary weight to dividends and minor weight to assets. This witness based his fundamental calculations on a price earnings ratio which he evolved from analysis of financial data *234 relating to a number of corporations primarily engaged in the publishing business. From a theoretical standpoint, there is much to be said for the general approach of this witness, but it is quite apparent that his basic premises were not sound because the publishing companies whose data was used in his calculations were in no real sense comparable to taxpayer, and there was no satisfactory effort to make practical adjustments which would render a comparison helpful. The value of the ratio adopted by the witness falls with the want of comparability. Moreover, the witness gave little regard to the special circumstances faced by petitioner with respect to valuation of a minority interest in a closely held corporation for the stock of which the market was very restricted. The witness was of the opinion that his calculations made appropriate allowance for such factors as replacement requirements and inadequate salaries paid by the corporation to managing officials. We think the value per share as determined by the witness was substantially based upon noncomparable data, without appropriate adjustment, which resulted in an ultimate valuation which was greatly excessive. The second *235 and final expert produced by respondent made allowance for inadequate salaries and requirements for current improvements. He also recognized a discount of 15 per cent in consideration of the fact that the stock represented a minority interest in a closely held corporation. He thereupon reconciled his views on the basis of three different approaches and concluded that the fair market value of the stock on the applicable valuation date was $3,400. This first method was to calculate average net income, after taxes, for three years, multiply it by 10, and add working capital in excess of six weeks' requirements. This approach has theoretical value, but loses its practical force primarily because the capitalization factor was a mere rule-of-thumb which, while witness had used it in his own business as a broker, was unsupported by reasoned analysis or recognized sanction as applied to the circumstances of this case. The second method used by the witness differed from the first in that he took average income before taxes and used a capitalization rate of 6.66 per cent. Like adjustments were made for working capital in excess of six weeks requirements. It was again apparent that the capitalization *236 rate was an unsupported rule-of-thumb. In his third method, the witness took the approximate annual average of gross sales for three years, to which he added working capital in excess of six weeks requirements. The validity of this approach has not been made apparent to us. With this witness (as with the four other experts) the crucial factor to be applied in determining ultimate value had little support beyond the personal opinion of the declarant. Here, again, we were not impressed with the significance of the rule-of-thumb ratios applied, and we think that the resultant valuation per share as determined by the witness was well in excess of its fair market value. In our own approach, we have, as indicated, given careful consideration to the testimony of the expert witnesses. We have analyzed, accepted, and coordinated those parts of their testimony which we deem helpful. We have made our own analysis of the data relating to earnings, dividends, and book value. We recognize the control of the Board of Directors by the Perkins family and its potential effect on declaration of dividends. We have given the weight we deemed appropriate to the adverse effect of the fact that the *237 block of stock to be valued was an unlisted stock representing a minority interest in a closely owned corporation, and that the market for such an interest was very limited. As to the restrictions on sale, while theoretically they should have little effect on price, we recognize the practical consideration that a prospective purchaser, other than one of the Perkins family, would hesitate to go to the expense entailed in investigating the facts essential to determining the price to be offered if such purchaser knew that the existing stockholders would have the prior right to purchase at the figure he might offer. We have considered the data with respect to other corporations furnished by petitioner's third and respondent's first expert witness, to the extent that such data pictures the requirements of the investing public under varying circumstances. Such information, with appropriate adjustment, is helpful in checking our own conclusions. We have considered the history of the corporation, information as to advertising and circulation, competitive factors including the question of national advertising and the degree to which there was a practical monopoly locally. We have likewise reviewed *238 the geographical extent of the company's activities. Both the management factor, and the inadequate salaries paid to management personnel have received our attention, as has the necessity for substantial replacement of facilities. We have examined the leases, and have recognized the circumstances with respect to ownership of circulation facilities. As previously indicated, the entire record has received careful attention. On the basis of our consideration, we have fused the elements in accordance with our judgment, and have reached the conclusion already announced as to fair market value of the particular stock as of the applicable valuation date. We add, for completeness, that petitioner urged on brief that respondent was estopped from determining a per share value in excess of $1,000 per share. The proposition is clearly without merit under the circumstances of this case, and we see no occasion to labor the point further. Decision will be entered under Rule 50. Footnotes
*. Reflects an adjustment of $37.00. ↩
**. Reflects and adjustment of ($110.00). ↩
***. Reflects an adjustment of $3,333.33. ↩
****. Reflects an adjustment of ($901.00).↩
*. Includes Reserve for Replacement of Machinery.↩